# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 13-231 |
| THOMAS PHELAN | : | |

### UNITED STATES' SENTENCING MEMORANDUM

Defendant Thomas Phelan owned and operated a mortgage brokerage business, Phelan Mortgage Associates, Inc. (PMA).   For two and a half years, the defendant conspired with a corrupt closing agent, O.J.; Phelan's minority partner/employee, G.W.; and others, to bilk mortgage lenders and financial institutions, by borrowing money to buy real estate, lying to the lenders to obtain financing far in excess of the value of the properties, and splitting the proceeds. While the details varied for each transaction, the pattern remained the same:   the defendant selected distressed properties and desperate sellers; he acted as the borrower, or selected a straw borrower; he falsely inflated the income of the buyers on the loan applications; he directed the corrupt closing agent to generated false HUD-1s[1] with inflated "sale" prices and non-existent down payments; and then split the loan proceeds with O.J. and G.W.

Phelan's scheme, motivated by greed, not only caused significant loss to financial institutions, it also harmed individual property owners who were victimized by his fraud.   For these reasons, as well as for the reasons provided below, the government recommends that the Court sentence the defendant to a term of imprisonment at the top of the range of 33 to 41 months, as recommended by the advisory Sentencing Guidelines.

---

[1]      A HUD-1 is a form used by a settlement or closing agent itemizing all charges imposed on a borrower and seller in a real estate transaction. This form gives a picture of the closing transaction, and provides each party with a complete list of incoming and outgoing funds. The HUD-1 is also known as a "closing sheet" or "settlement form."

## I.    BACKGROUND.

On October 15, 2013, pursuant to a written plea agreement, the defendant pled guilty to Counts One through Five of the indictment, charging him with conspiracy to commit loan and wire fraud, in violation of 18 U.S.C. § 371 (Count One); three counts of loan fraud, in violation of 18 U.S.C. § 1014 (Counts Two, Three and Four); and one count of wire fraud, in violation of 18 U.S.C. § 1343 (Count Five).   During his plea colloquy, the defendant admitted that from August 2006 to February 2009, he conspired with his partner/employee, G.W., the closing agent, O.J., and others to defraud mortgage lenders and financial institutions out of more than a million dollars by fraudulently misrepresenting the values of real estate, the financial condition of the buyers and the nature of the purchase transactions.   The defendant admitted further that he led G.W. and O.J. in defrauding both financial institutions with deposits insured by the FDIC and companies that provided mortgage loans.

The defendant admitted that he and his co-conspirators made money for themselves by arranging real estate deals in which homes were purchased for inflated prices so that the buyers could get tens of thousands of dollars back at closing; that this fact was not disclosed to the lenders; that the borrowers qualified for mortgages using false information such as inflated income and asset information, under-reported debt information, and false representations of primary residence; and that the lenders did not know that the buyers' information was false.   The defendant admitted that he knew that the transactions were structured so that the buyers did not need to put any money down to make the purchases; that he knew further that the buyers would receive substantial amounts of money back at closing; and that in fact defendant Phelan structured the transactions to mislead the mortgage lenders about whether and how much cash buyers were investing in the properties.   The defendant admitted that he directed completion of the buyers' loan applications,

and helped in completing some applications, using false information about the buyers that he knew was false, including the amounts of the buyers' income, assets and debts.   The defendant admitted that he directed that false HUD-1 settlement statements for the transactions be prepared by O.J., which reflected inflated purchase prices, non-existent down payments that buyers never made, and did not reflect the money back that buyers received at closings.   Finally, the defendant admitted that his actions caused significant loss to the financial institutions.   With allowance for appropriate setoffs, that loss is nearly $1,000,000.

## II.   SENTENCING CALCULATION.

    A.   Statutory Maximum Sentence.

By law, the Court may impose at most 115 years in prison, a five-year period of supervised release, $4,250,000 fine, and a mandatory $500 special assessment.[2]   Full restitution of $850,570 may also be ordered.   Forfeiture of all proceeds of the offenses also may be ordered.

    B.   Sentencing Guidelines Calculation.

In the Presentence Report (PSR), the Probation Office calculated the defendant's advisory sentencing guideline range as 51 to 63 months in prison based on a total offense level of 24 and a Criminal History Category I (PSR ¶ 97, p. 17).

The parties are in agreement that a lower advisory range should apply.   The parties agree with the PSR's calculation of the base offense level as 7 (¶ 43, p. 9), but then part ways with the PSR writer.   The parties agree that the fraud loss, after setoffs, is between $400,000 and

---

[2]   Count One, conspiracy to commit loan fraud and wire fraud in violation of 18 U.S.C. § 371: five years' imprisonment, three years' supervised release, a $250,000 fine and a $100 special assessment; on each of Counts Two through Four, charging three counts of making false statements on a loan application, in violation of 18 U.S.C. § 1014: 30 years' imprisonment, a $1,000,000 fine, five years' supervised release, and a $100 special assessment; Count Five, wire fraud, in violation of 18 U.S.C. § 1343: 20 years' imprisonment, a fine of $1,000,000, five years' supervised release and a $100 special assessment.

$1,000,000, which adds 14 levels to the base offense level, rather than the 16 levels set out in the PSR (¶ 44, p. 9).   The PSR applies a two-level enhancement for sophisticated means, pursuant to USSG § 2B1.1(b)(10)(C), which, when added to the agreed-upon 2-level enhancement for a leadership role, would raise the offense level to 27 before credit for acceptance of responsibility (PSR ¶¶ 45, 47, 49).   The United States takes no position on the sophisticated means enhancement, and the defense opposes it.   Thus the parties would urge that the adjusted offense level is 23 instead of 27.   Credit for acceptance of responsibility lowers the offense level three levels (PSR ¶ 51); the parties agree that the total offense level should be calculated as 20 rather than 24, yielding an advisory range of 33 to 41 months in prison.

## III.   <u>ANALYSIS.</u>

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the most appropriate sentence is one at the top of the agreed-upon advisory Sentencing Guideline range of 33 to 41 months in prison.

The Supreme Court has declared:   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." <u>Gall v. United States</u>, 522 U.S. 38, 49-50 (2007).   Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

The Court must also consider all of the sentencing considerations set forth in Section 3553(a).   Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public

4

from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.   18 U.S.C. § 3553(a).[3]

**Consideration of the 3553(a) Factors.**

**A.      Nature and Circumstances of the Offense and History and**
**         Characteristics of the Defendant**

The defendant committed a serious offense.   For two and a half years, he used his business to commit large-scale mortgage fraud.   By creating and directing others to create a myriad of false loan documents, he purchased and helped others to purchase more than twenty (20) properties through deceit.   Phelan lined his pockets with the proceeds of mortgage fraud, bilking financial institutions out of nearly $1,000,000.   While financial institutions can and do take steps to protect themselves against fraud, of necessity they must rely on the truth of the information provided to them, in order to decide whether or not to grant loans.   Organized mortgage fraud schemes like the one Phelan engineered hurt not only financial institutions, but many others in our community.   They hurt desperate sellers who are tricked into selling their homes by promises that

---

[3]   Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."   The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'"   United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

the buyers will help them pay outstanding debts from loan proceeds.   They hurt innocent people whose property is stolen from them and sold to charlatans.   Mortgage fraud schemes make it harder for ordinary people to borrow money, and the damage from mortgage frauds to property values hurts public schools and neighborhoods, including residents who hope their homes will be a retirement nest egg.

In addition, in considering the nature of Phelan's offenses, this Court should also take into account the impact of the defendant's crimes on victims other than the lenders.   One victim, Mrs. M., lived with her husband at 3945 Countrywood Lane, Hatboro PA (the subject of Count Two), in the family home that they owned.   The Ms contacted the defendant to assist them in refinancing their home.   The defendant met with the Ms and told them that refinancing would not work; instead, the defendant proposed that he buy the Ms' house himself.   Phelan told the Ms that they could stay in their home as tenants, and they could buy it back from him when their financial situation improved.   Phelan promised the Ms that he would place $25,000 of the loan proceeds in escrow and this money would be used to pay their first year of rent to him.   Phelan also promised that additional proceeds would be used to pay down the Ms' debt, including a debt of more than $15,000 to the IRS, secured by a lien on their home.   Acting on the defendant's proposal, and believing his promises, the Ms sold their house to Phelan on October 30, 2006 for $400,000.   Phelan financed his purchase by means of two fraudulent loans in the total amount of $360,000[4].   While the HUD-1 for the sale stated that the Ms would receive $71,175.68 at

_____

[4] As Phelan admitted at the change of plea hearing, he falsely stated on the application that: the home would be his primary residence, when in fact he intended, and did, rent the home back to the sellers.   He also stated falsely that his monthly employment income was $13,450 plus a $4,000 bonus, that is, $165,400 annually, when in reality his income was approximately $68,197 in 2006.   Phelan stated falsely that he had made a down payment of $7,128 and would come to closing with additional cash of $73,872, when he made no down payment at all, and brought no cash to settlement, instead bringing a "show check" to be placed in the closing file to deceive the

closing, the Ms got nothing.   And Phelan neither paid off the Ms' debt to IRS, nor opened the escrow account.   Phelan told the Ms that there were not sufficient proceeds to escrow the rent as he had promised.   But this was a lie:   Phelan took more than $39,000 in proceeds from the fraudulent loan he had engineered, and put it in bank accounts that he controlled.   The Ms fell behind on their rent payments to the defendant, and, when the property went into foreclosure, Phelan sued to evict them.

Another victim, P.C., was executor of her grandmother's estate, which included a row home at 1731 Webster Street in Philadelphia (the subject of Count Four).   P.C. was acquainted with a lawyer, R.H., who learned about the 1731 Webster Street property.   After the property was renovated without P.C.'s knowledge or consent, the defendant bought the property, on March 30, 2007, for $420,000, having obtained by fraud a $378,000 mortgage.[5]   The lawyer R.H., Phelan, O.J., and others attended the closing, but P.C. did not.   P.C. only learned about the theft of the property afterwards.   The falsified HUD-1 stated that the seller was P.C.'s grandfather, Scott Mack, who had died in 1983.   After the closing, defendant Phelan split the loan

---

lender.

On the 3945 Countrywood Lane sale, Phelan was paid $6,900 in brokerage fees for handling his own fraudulent loan, as well as $33,062.12 in proceeds from the settlement, for a total of approximately $39,000 in fraudulent proceeds – none of which Phelan was entitled to take (indictment, overt acts 4 and 5, pp. 5-6).   This was the money that Phelan had promised the sellers that he would use to (a) pay off the IRS lien on their home; and (b) put in escrow for them to use to pay their first year's rent to him.   Needless to say, Phelan did neither, instead pocketing the money for himself.

[5] As Phelan admitted at the change of plea hearing, he falsely stated on the loan application that:   the home would be Phelan's primary residence, when he never lived there and never intended to live there; his monthly employment income was $15,000 plus a $5,000 bonus, or $240,000 annually, when in reality his income from employment in 2007 was under $100,000; and that he had made a cash deposit of $42,000 when he made no deposit at all, instead bringing a "show check" to closing to put in the file and deceive the lender.

proceeds with other conspirators.   P.C. never received any of those proceeds.   Her grandmother's property was stolen from her and purchased by the defendant.

Both Mrs. M. and P.C. plan to be present at the sentencing hearing on February 5, 2014, and wish to address the Court regarding the impact of Phelan's crimes.

### 1.   Defendant's Significant Role In The Offenses.

As Phelan has stipulated, as the primary owner of his mortgage brokerage business, he organized and led the mortgage fraud in this case.   Phelan found the distressed properties and the desperate sellers, and when it was in his interest, he lied to naïve sellers to trick them into selling their homes.   He brought the deals to his partner/employee, G.W., and the corrupt closing agent, O.J., and directed them to generate the false documents that would allow the loans to go through.   He decided what lies to tell to what lenders.   He openly bragged about submitting documents to lenders, that he, Phelan, had created to get the deal done.

Phelan's position as a licensed mortgage broker also gave him specialized knowledge of how the mortgage and loan industry operated.   He was well acquainted with how to process loans, which documents were required, and which documents the lenders would not require.   He knew how to push a loan through, and what would make an application most likely to be approved.   Moreover, as a mortgage broker, the defendant knew how to draft and process all of the required documents.   In addition, because he worked as a mortgage broker, the defendant had contacts and business relationships in the lending field.   Indeed, Phelan recruited his minority partner/employee G.W. and O.J., the corrupt title agent, to participate in his criminal activity, and exploited others, all of whom were known to him because of his employment as a mortgage broker and his operation of PMA.   His relationships with other brokers and with O.J.'s title company facilitated the processing of his loan applications in a way that would not have been afforded to a

member of the general public.   In fact, Phelan was so well placed that he was able to demand, and

receive, kickbacks from O.J. as a condition of O.J.'s title company being allowed into Phelan's

fraudulent deals (instead of offering kickbacks to O.J. to ensure that O.J.'s title company would

close on loans with falsified documentation, as often is done by loan fraudsters).   Phelan was the

moving force behind an organized mortgage fraud scheme, which speaks volumes about his

character and his capacity for rehabilitation.

### 2.        Defendant's History and Characteristics.

This Court should consider Phelan's personal history and characteristics.   In so

doing, it bears noting that while his parents divorced when he was small, the defendant grew up

with some advantages, notably the advantage of a private college preparatory boarding school

education at the School at Church Farm.   (PSR ¶ 75, letters of support).

After receiving his high school diploma from Ridley High School and attending

college for several years, the defendant became a mortgage broker and loan officer, working for

banks and financial institutions from 2001 through 2003 (PSR ¶¶ 75-76, 78).   In May 2003,

Phelan opened his own company, Phelan Mortgage Associates (PMA), in Feasterville, PA.   PMA

was the vehicle through which the defendant committed the crimes for which he will be sentenced

(PSR ¶ 77).   Unlike many less-privileged defendants whom this Court sees, Phelan had no reason

to turn to crime.   As a licensed mortgage broker, the defendant was entrusted with helping home

buyers obtain loans to finance what is, for most people, the most significant purchase they will

ever make.   Although his skills gave him the opportunity to assist home buyers to fulfill their

dreams, for two and a half years, he chose instead to harm the community.

Phelan's counsel argues that the defendant's "relatively quick" decision to accept

responsibility for his crimes shows a commitment to obey the law in the future.   Def. Mem. p. 3.

But Phelan was served with a target letter in December 2009.   At that time, he told the agent that he was paying back some people who had made investments with him, and expected to pay off others with proceeds from upcoming real estate closings.   But Phelan was indicted by the grand jury, not charged by information, three and a half years later, in May 2013, making his decision to accept responsibility less than speedy.   Similarly, counsel claims that the relationships evidenced by the character letters before the Court show that Phelan has learned his lesson and is now committed to leading a law-abiding life.   But while it is good that Phelan enjoys the support of friends and relatives, it is noteworthy that some letter writers state that the defendant helped them financially, while others state that Phelan donated money to others.   During the indictment period, while Phelan was committing large-scale mortgage fraud, he obviously had fraud proceeds available to him to give to others; he should not get credit for donating other peoples' money. And the letters from people who have known the defendant for many years, while heartfelt, show no understanding of the other side of Thomas Phelan, the high-living fraudster who lied to financial institutions and hurt individuals without remorse.

### 3.    Defendant's Medical Circumstances

Through counsel, the defendant reported to the Probation Officer that he is being treated for a medical condition and psychological issues.   (PSR ¶¶ 72-73, pp. 12-13).   In the defense sentencing memorandum, counsel identifies the medical condition as Klinefelter's Syndrome, a genetic condition limiting the amount of testosterone produced in the body.   Def. Mem. p. 4.   The defense states that Phelan's medical condition will require treatment while he is incarcerated.   However, the defense has conceded, as it must, consistent with the stipulations defendant made in his plea agreement, that the defendant's medical condition is not a basis for a downward departure.   This stipulation is well-grounded in fact, because as the defense also

concedes, the Bureau of Prisons is capable of providing adequate treatment to defendant Phelan during incarceration. Thus the parties are in agreement that the defendant can receive appropriate treatment in prison. Accordingly, there is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." 18 U.S.C. § 3553(a)(2)(D).

**B.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

The defendant engaged in his charged conduct for approximately two and a half years. The need for a sentence to promote respect for the law is among the most important sentencing principles established by Congress. See Gall v. United States, 128 S. Ct. 586, 599 (2007) (recognizing "[t]he Government's legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law   . . ."). The defendant created, managed and supervised his mortgage brokerage business so as to maximize the number of fraudulent loans generated, all in order that Phelan could take every cent that he could from the proceeds of each fraudulent loan deal. His crime showed no respect for the laws that require all citizens to make truthful statements to each other in commercial transactions. A just punishment for Phelan's leadership of an ongoing, large-scale mortgage fraud should be sufficient to show that lying on loan documents repeatedly will not be tolerated.

**C.      The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant.**

The defendant might claim that because of the fact that PMA is not currently dealing in private real estate ventures (PSR ¶ 77, p. 13), there is no need for the Court's sentence "to protect the public." While the facts of this case show that a stiff sentence is needed to deter Phelan individually, the § 3553 provision which encompasses protection for the public, also

involves deterrence which goes beyond the defendant being sentenced.

> When passing the Sentencing Reform Act, Congress explained:

> [It is our] view that in the past there have been many cases, particularly in instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures . . . and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a white collar criminal] may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

S. Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75.

> Investigations of mortgage fraud can be complex and take many months, if not years.   The government simply does not have the resources to investigate every broker engaged in loan fraud.   Thus, imposition of a sentence at the top end of the guideline range provides not only specific but also general deterrence to others who would commit a similar offense.   As Courts of Appeals have held, Section 3553(a) is not limited to deterrence of the particular defendant.   See United States v. Eura, 440 F.3d 625, 638 (4th Cir. 2006) (concurring opinion) (referring to the court's consideration of "the general deterrence factor, § 3553(a)(2)(B)"); United States v. Jordan, 435 F.3d 693, 698 (7th Cir. 2006) (describing how Section 3553(a) "specifies that the court may consider the need for general deterrence and respect for the law"); United States v. Glover, 431 F.3d 744, 751 (11th Cir. 2005) (noting that pre-Booker and post-Booker, "the underlying goals of the statute and the Guidelines are retribution, general deterrence, incapacitation, and rehabilitation" (internal quotation marks omitted)); see also United States v. Yeaman, 248 F.3d 223, 232 (3d Cir. 2001) (referring to Section 3553(a)'s goals of "general deterrence, specific deterrence, retribution, and rehabilitation").

**D.    The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.**

The need to avoid unwarranted sentencing disparity is a factor not primarily concerned with sentencing disparities in a particular case; it is designed to ensure sentencing consistency among similarly situated defendants across the entire nation. See United States v. Parker, 462 F.3d 273 (3d Cir. 2006); United States v. Carson, 560 F.3d 566, 586 (6th Cir. 2009) ("Although it is true that § 3553(a)(6) requires a sentencing judge to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,'" that "factor 'concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct – not disparities between co-defendants.'").   Here, under the facts of Phelan's case, imposition of a sentence at the top end of the guideline range will serve to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.   This is especially so given the aggravating factors present in Phelan's case:   his callous disregard for the human victims of his fraud such as P.C. and Mr. and Mrs. M; the brazenness of his fraud, as shown by the outright theft of 1731 Webster Street from P.C. and his bragging about creating false documents; and his waste of the proceeds of the fraud.

**E.    Restitution.**

Restitution is a significant issue in this case, but it should not diminish the sentence of incarceration to be imposed.   § 3553(a)(7).   While the defendant has agreed to make restitution in this case, it is significant to note that the government was not able to recover any funds.   Instead, the defendant appears to have squandered the proceeds of his fraud; notably, he spent in excess of $300,000 on visits to gentlemen's clubs and stays at the Four Seasons Hotel. The likelihood that any of the victims will ever be made whole is remote.   Nonetheless, this Court

13

should still impose a restitution schedule of sufficiently large payments to provide incentive for him to never become involved in criminal activity in his lifetime.

## IV. <u>CONCLUSION</u>

In sum, all of the appropriate considerations of sentencing favor the imposition in this case of a sentence at the top end of the agreed-upon guideline range, 33 to 41 months in prison. The United States respectfully requests that the Court also impose 36 months of supervised release; restitution of $850,670; and an assessment of $500.   A fine should be waived given the large amount of restitution owing.   The United States further requests that the defendant be prohibited from working as a licensed mortgage broker during the period of supervised release.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


*/s/ Mary E. Crawley*
MARY E. CRAWLEY
Assistant United States Attorney

January 30, 2014

14

<u>**CERTIFICATE OF SERVICE**</u>

The foregoing Government's Sentencing Memorandum is being served electronically

through the District Court Electronic Case System upon:

**ARTHUR THOMAS DONATO, JR., ESQUIRE**
216 West Front Street
2nd Floor
Media, PA 19063

 */s/ Mary E. Crawley*
MARY E. CRAWLEY
Assistant United States Attorney

Dated: January 30, 2014

15